PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUNEER TAWAM, REBEKA RODRIGUEZ, individually and on behalf of those similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>FELD ENTERTAINMENT, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. 3:23-cv-00357-BEN-JLB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Filed: January 24, 2023<br>Removed: February 24, 2023 |

## I.     INTRODUCTION

1.     Whenever someone watches a video on https://www.monsterjam.com/en-US (the "Website"), Defendant Feld Entertainment, Inc. ("Defendant") secretly reports all the details to Google and/or Facebook: the visitor's personally identifiable information ("PII"), the titles watched, and more. Why? Data harvesting and targeted advertising.

2.     As shown below, Defendant's actions violate the Video Privacy Protection Act of 1988, 18 U.S.C. §§ 2710 *et seq.* ("VPPA"). As such, Defendant is liable to each Class member for $2,500 and related relief.

## II.     JURISDICTION AND VENUE

3.     Plaintiffs Muneer Tawam and Rebeka Rodriguez ("Plaintiffs") do not dispute Defendant's removal of this action to the United States District Court pursuant to 28 U.S.C. §§ 1331, 1441(a).

## III.     PARTIES

4.     Plaintiff Muneer Tawam is an individual and a consumer advocate. He visited Defendant's Website in January 2023 and played the video, "WEEKEND RECAP: 2023 MONSTER JAM SEASON ROARS TO LIFE" thereon.

5.     Plaintiff Rebeka Rodriguez is an individual and consumer advocate. She visited Defendant's Website in March 2023 and played the video, "Monster Jam- BKT Behind the Wheel" thereon while located in this District.

6.     Defendant is a for-profit Delaware corporation with its principal place of business in Palmetto, Florida. Defendant owns and promotes the popular monster truck events and rallies across the United States. Defendant owns, operates, and/or controls the Website.

7.     The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendant." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of

1  the Defendants designated herein as a DOE is legally responsible for the unlawful acts

2  alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the

3  true names and capacities of the DOE Defendants when such identities become known.

### IV.  FACTUAL ALLEGATIONS

### A.  THE FACEBOOK TRACKING PIXEL

8.  Facebook is a social networking company where users are required to identify themselves by "the name they go by in everyday life."[1]  To create a Facebook account, a user must provide first name, last name, date of birth and gender.[2]

9.  Facebook generates revenue by selling advertising space on its website based upon its ability to identify user interests.[3]  Facebook can identify user interests by monitoring "offsite" user activity, which allows Facebook to judge user interests beyond what users freely disclose.[4]

10.  Facebook enables advertisers to identify "people who have already shown interest in [their] business", which Facebook calls "Custom Audiences."[5] The Custom Audiences tool requires advertisers to supply user data to Facebook, and most do so via the Facebook Tracking Pixel.[6]

11.  The Facebook Tracking Pixel is a device included programming code that advertisers can integrate into their website.  Once activated, the Facebook Tracking

---

[1]  FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity (last visited April 2023).
[2]  FACEBOOK, SIGN UP, https://www.facebook.com/ (last visited April 2023).
[3]  FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/20502906038706 (last visited April 2023).
[4]  FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting (last visited April 2023).
[5]  FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273 (last visited April 2023).
[6]  FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097533764    94 (last visited April 2023); FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited April 2023).

Pixel "tracks the people and type of actions they take."[7]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook, which Facebook then assimilates into the Custom Audiences dataset.

12.     Advertisers control what actions—or, as Facebook calls it, "events"— the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[8]

13.     Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[9] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[10] Pixel-specific Data includes "the Pixel ID and cookie."[11]

**B.     HTTPS://MONSTERJAM.COM/EN-US/ AND FACEBOOK**

14.     The VPPA defines PII to "include[]" "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).  This means "information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'"  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 290 (3d Cir. 2016)).

15.     Part of Defendant's business involves increasing its brand presence via the use of videos.  Consistent with its business model, the https://www.monsterjam.com/en-us/ Website delivers embedded and hosted video content:

**FIGURE 1**

---

[7] FACEBOOK,RETARGETING, https://www.facebook.com/business/oals/reta getting.
[8] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited April 2023).
[9] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/ (last visited April 2023).
[10] *Id.*
[11] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13



14    16.    Defendant discloses information which allows Facebook (and any ordinary

15    person) to identify a user's video-watching behavior:

16    **FIGURE 2**

17

18

19    

20

21

22

23

24    17.    Defendant configured the PageView event to transmit the Universal

25    Resource Locator ("URL") and the category of content selected:

26    **FIGURE 3**

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17

18.     In the above figure, for example, Defendant discloses a webpage's URL.

18

19.     Defendant has configured the microdata to disclose the video's title and

19

other descriptors:

20

**FIGURE 4**

21
22
23
24
25
26
27
28



20.    The aggregate pixel events (Page View and Microdata Automatically Detected) permit an ordinary person to identify a video's content, title, and location.

21.    When a visitor watches a video on https://www.monsterjam.com/en-US/ while logged into Facebook, Defendant compels a visitor's browser to transmit the c user cookie to Facebook. The c user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, Defendant compelled the browser to send eight cookies:

**FIGURE 5**

| Name | Value | Domain |
|------|-------|--------|
| wd | 1274x721 | .facebook.com |
| dpr | 2 | .facebook.com |
| sb | Z7VeY5082d… | .facebook.com |
| datr | ErdeY8DwZ… | .facebook.com |
| xs | 36%3AEE9Y… | .facebook.com |
| presence | C%7B%22t3… | .facebook.com |
| c_user | 1000872713… | .facebook.com |
| fr | 0NeV0YDwu… | .facebook.com |

22.     When a visitor's browser has recently logged out of Facebook, Defendant will compel the browser to send a smaller set of cookies.

23.     The fr cookie contains an encrypted Facebook ID and browser identifier.[12] The datr cookie also identifies a browser.[13]  Facebook, at a minimum, uses the fr cookie to identify particular users.[14]

**FIGURE 6**

| Name | ▲ | Value | Domain |
|------|---|-------|--------|
| _fbp | | fb.1.1681335… | .monsterjam.com |

---

[12] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v facebook.org/ODPC_Review.pdf (last visited April 2023).
[13] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/ (last visited April 2023).
[14] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/ (last visited April 2023).

24.     The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., https://www.monsterjam.com/en-us.[15] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[16] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

25.     Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

26.     A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

27.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what videos users of the https://www. monsterjam.com/en-us Website have watched.[17]

28.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Defendant knowingly discloses information sufficient to permit an ordinary person to identify a specific individual's video viewing behavior.

29.     By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for videos, Defendant knowingly discloses information sufficient to permit an ordinary person to identify a specific individual's video viewing behavior.

---

[15] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last visited December 15, 2022). This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[16] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last visited December 15, 2022). This is also confirmable by tracking network activity.
[17] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started (last visited April 2023).

30.   Facebook confirms that it matches activity on the https://www. monsterjam.com/en-us Website with a user's profile.   Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[18]   The off-site activity report confirms that Defendant identifies an individual's video viewing activities.

31.   Plaintiff Tawam has a Facebook account, played a video on the https://www.monsterjam.com/en-US Website, and had his PII and video viewing behavior disclosed by Defendant to Facebook in the foregoing manner.

## C.   GOOGLE ANALYTICS

32.   Google Analytics is part of the Google Marketing Platform and is available for free to anyone with a Google account. There are two commonly used versions of Google Analytics: Google Analytics 3 (Universal Analytics) and Google Analytics 4 (GA4). Universal Analytics is the legacy version of Google Analytics and is slowly being phased out.[19]   GA4 is the latest version of Google Analytics that was launched in 2020.[20]   The tools are materially similar in how they collect and transmit website analytics data to Google. [21]

33.   Google Analytics acquires user data from each website visitor using one or more tracking tags installed on a website. A tracking tag is a small piece of JavaScript code that the website owner inserts into the existing code of each page. The Google

---

[18] *See* https://www.facebook.com/help/2207256696182627 (Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity." What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device.") (last visited April 2023).

[19] ABOUT UNIVERSAL ANALYTICS, https://support.google.com/analytics/answer/2790010?hl=en (last visited April 2023).

[20] [GA4] INTRODUCING THE NEXT GENERATION OF ANALYTICS, GOOGLE ANALYTICS 4, https://support.google.com/analytics/answer/10089681?hl=en (last visited April 2023).

[21] UNIVERSAL ANALYTICS VERSUS GOOGLE ANALYTICS 4 DATA, https://support.google.com/analytics/answer/9964640?hl=en&ref_topic=12153646,12153943,2986333,&visit_id=638115536489543614-1150820823&rd=1#zippy=%2Cin-this-article (last visited April 2023).

Analytics tracking tags run in the web browser of each visitor, collecting data and sending it to Google's data collection points.

34. Website owners control what data the Google Analytics tracking tag will collect, including the website's metadata, along with what pages a visitor views.

35. Website owners control how the Google Analytics tracking tag identifies visitors. The Google Analytics tracking tag is configured to collect "HTTP Headers" and "Event Parameter" data. HTTP headers include data such as IP Address, User Agent String, and Language. HTTP headers are sent to Google from the web browser with every Google Analytics event that is tracked. Event Parameters vary based on the type of event and may include data such as web form interactions, video views, file downloads, page scrolls, web searches, etc.[22]

36. Google Analytics can generate customizable reports to track and visualize data such as the number of users, bounce rates, average session durations, sessions by channel, page views, conversions (such as purchases and adding products to carts), and more. Google Analytics is "designed to work together" with other Google Marketing Platform products to help measure, understand and enhance a website's digital marketing.[23] For example, website owners can easily export data from Google Analytics to Google Marketing products to generate audience segments to facilitate targeted advertising.

**D.    HTTPS://WWW.MONSTERJAM.COM/EN-US/     AND     GOOGLE ANALYTICS**

37. Defendant delivers embedded video content on the https://www.monsterjam.com/en-US Website and has Google Analytic/Google Tag Manager enabled on the webpages.

**FIGURE 7**

---

[22]    [GA4] ENHANCED EVENT MEASUREMENT, https://support.google.com/analytics/answer/9216061 (last visited April 2023)
[23]  GOOGLE MARKETING PLATFORM, ABOUT GOOGLE ANALYTICS, https://marketingplatform.google.com/about/analytics/  (last visited April 2023)



**FIGURE 8**



FIRST AMENDED COMPLAINT

38.     Defendant has configured Google Analytics to submit data to Google whenever a video on the page is played. This includes the video title and url, how long the viewer has been watching, and the _gid cookie.

**FIGURE 9**



39.     The _gid cookie submitted is a unique personal identification number for Google accounts. This data is stored and readily accessible by the Defendant's Website.

**FIGURE 10**



| Name | Value | Domain |
|------|-------|--------|
| _gid | GA1.2.25019670... | .monsterjam.com |

40.     The _gid cookie stored from the Website on the browser matches the _gid submitted to Google.

41.     Defendant's actions readily permit an ordinary person to identify Class members' video-watching behavior.

42.     Plaintiff Rodriguez uses a Google browser, played a video on the https://www.monsterjam.com/en-US/ Website, and had her video viewing behavior disclosed by Defendant to Google in the foregoing manner.

## E.      DEFENDANT IS A "VIDEO TAPE SERVICE PROVIDER" UNDER THE VPPA

43.     Defendant is engaged in the business of "rental, sale, *or delivery of* prerecorded video cassette tapes *or similar audio visual materials*."  18 U.S.C. § 2710(a)(4) (emphasis added).   Specifically, Defendant's business model involves monetizing videos.  As such, Defendant is a "video tape service provider" under the VPPA because, as part of its business, Defendant delivers "prerecorded video" content or other "similar audio visual materials." 18 U.S.C. § 2710(a)(4).  Federal courts have interpreted the term, "video tape service provider" to include commercial website owners/operators like Defendant.  *See, e.g., Czarnionka v. The Epoch Times Ass'n*, Inc., 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at *1, *3 & n.2 (N.D. Ga. Nov. 4, 2022); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sep't 12, 2022); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 798-99 (N.D. Cal. 2019); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019); *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482, 485 n.2 (1st Cir. 2016); *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

44.     The Website hosts and delivers content, including videos, as set forth above.

## F.      PLAINTIFFS ARE "CONSUMERS" UNDER THE VPPA

45.     The VPPA defines the term "consumer" to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

46.     Both Plaintiffs have played videos on the Website.  Plaintiffs also signed up for Defendant's email list serve after viewing the videos on the Website.  As such, Plaintiffs are "subscribers" of goods or services from a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(1).  *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487-90 (1st Cir. 2016) ("[Plaintiff's] decision to download the App seems a fair enough indication that he intended more than a one-shot visit.").

47.     Plaintiffs are consumer privacy advocates with dual motivations for watching videos on Defendant's Website.  First, Plaintiffs were genuinely interested in learning more about Defendant and its services offered.  Second, Plaintiffs are "testers" who work to ensure that companies abide by the privacy obligations imposed by federal law.  As someone who advances important public interests at the risk of vile personal attacks, Plaintiffs should be "praised rather than vilified."  *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).

48.     In enacting the VPAA, Congress intentionally chose to extend its protections to all persons who watch videos, not simply those who purchase them or claim pecuniary loss.  As such, statutes like the VPPA are largely enforced by civic minded "testers" such as Plaintiffs.  *See Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109 (9th Cir. 2014) (explaining why testers have Article III standing and generally discussing value and importance of testers in enforcement of consumer protection and civil rights statutes).

49.     When Plaintiffs played the videos on the Website, Defendant disclosed event data, which recorded and disclosed the videos' titles, descriptions, and URLs, to Facebook and/or Google.  Alongside this event data, Defendant also disclosed identifiers for Plaintiffs, including the c_user and fr cookies.  In other words, Defendant did exactly what the VPPA prohibits:  it disclosed Plaintiffs' video viewing habits to a

third party.

50.     In summary, based upon the preceding information transmitted by Defendant to Facebook and Google, Defendant enabled *any* individual who possesses basic reading skills to identify the title of videos viewed by any Class member, because the title of every video watched is transmitted by Defendant to Facebook and Google.

51.     Defendant's conduct is illegal, offensive, and contrary to visitor expectations.

52.     By disclosing Plaintiffs' event data and identifiers to Facebook and Google, Defendant knowingly disclosed Plaintiffs' PII to a third-party.

## V.     CLASS ALLEGATIONS

53.     Plaintiffs bring this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons in the United States who are consumers under the VPPA who played video content on https://www.monsterjam.com/en-US, or any other website owned, operated, or controlled by Defendant, and whose PII was disclosed by Defendant to Facebook, Google or any third party during the two years preceding the filing of this action (the "Class Period").**

54.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**   At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website and the prevalence of Defendant's services across the United States, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

55.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

        a)     whether Plaintiffs and the Class are within the definition of the term, "consumer," as used in the VPPA;

b)     whether Defendant collected Plaintiffs' and the Class's PII;

c)     whether Defendant unlawfully disclosed and continues to disclose their users' PII in violation of the VPPA;

d)     whether Defendant's disclosures were committed knowingly; and

e)     whether Defendant disclosed Plaintiffs' and the Class's PII without consent.

56.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, played videos on Websites owned, operated, or controlled by Defendant, and had PII collected and disclosed by Defendant.

57.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):**  Plaintiffs retained qualified and competent counsel who are highly experienced in complex consumer class action litigation.  Moreover, Plaintiffs will fairly and adequately represent and protect the interests of the Class.

58.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

# VI.    CAUSE OF ACTION

## VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT

### 18 U.S.C. § 2710 *et seq.*

59.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs above as if fully set forth herein.

60.    Defendant is a "video tape service provider[s]" that creates, hosts, and delivers videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Defendant also uses the videos to collect and disclose viewers' PII so it can later retarget them for advertisements.

61.    Plaintiffs and members of the Class are "consumers" as set forth above. They have also played videos on the Website owned, operated and controlled by Defendant. 18 U.S.C. § 2710(a)(1).

62.    Defendant knowingly disclosed to third parties, Facebook and Google, Plaintiffs' and the Class members' PII. Defendant utilized the Facebook Tracking Pixel and Google Tracking Pixel to compel Plaintiffs' web browsers to transfer Plaintiffs' identifying information, like their Facebook IDs, along with Plaintiffs' event data, like the title of the videos that Plaintiffs played.

63.    Plaintiffs and the Class members played videos on the Websites.

64.    Defendant knowingly disclosed Plaintiffs' and Class members' PII because Defendant used that data to build audiences on Google and Facebook and retarget them for its advertising campaigns.

65.    Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

66.  Defendant's disclosures were not made in the "ordinary course of business" as the term is defined by the VPPA because they were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

## VII.   __PRAYER FOR RELIEF__

WHEREFORE, Plaintiffs seeks judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class;

b.   For an order declaring that Defendant's conduct violates the VPPA;

c.   For an order finding in favor of Plaintiffs and the Class on the cause of action asserted herein, including all available damages;

d.   For prejudgment interest on all amounts awarded;

e.   For injunctive relief to stop the illegal conduct;

f.   Awarding Plaintiffs and the Class reasonable attorneys' fees, expenses and costs of suit; and

g.   For any and all other relief, at law or equity, that may be appropriate.

Dated:  April 16, 2023

PACIFIC TRIAL ATTORNEYS
A Professional Corporation

By:_____
Scott J. Ferrell
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

/s/ Scott J. Ferrell
Scott J. Ferrell